UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **10 CR 0080** |
| | ) | |
| v. | ) | Violations: Title 18, United States Code, |
| | ) | Sections 2, 1001(a)(2), and 1341 |
| AZTECA SUPPLY CO., | ) | |
| AURORA VENEGAS, and | ) | **JUDGE DOW** |
| THOMAS MASEN | ) | |

**MAGISTRATE JUDGE KEYS**

**FILED**

FeB 4, 2010
FEB - 4 2010
2-4-10
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COUNT ONE

The SPECIAL FEBRUARY 2008-2 GRAND JURY charges:

1.      At times material to this indictment:

#### Relevant Persons and Entities

a.      Defendant AZTECA SUPPLY COMPANY was an Illinois corporation that was in the business of supplying products and services. AZTECA SUPPLY COMPANY had an office in Chicago, Illinois.

b.      Defendant AURORA VENEGAS was the President and sole owner of defendant AZTECA SUPPLY COMPANY.

c.      Company A was a concrete pipe manufacturing company in Franklin Park, Illinois. Defendant AURORA VENEGAS was a former employee of Company A.

d.      Defendant THOMAS MASEN was the comptroller and secretary of Company A. THOMAS MASEN was married to defendant AURORA VENEGAS.

e.      Company B was a supplier of feminine hygiene disposal units and disposal services. Company B had a facility in Naperville, Illinois.

      f.      Company C was a landscaping company that provided landscape installation and renovation.  Company C had a facility in Oswego, Illinois.

      g.      Company D was in the landscape supply business, and provided plant products to landscape professionals.  Company D had a facility in Addison, Illinois.

      h.      Company E was in the general contracting business.  Company E had a facility in Elgin, Illinois.

      i.      Company F was in the contracting business.  Company F had a facility in Chicago, Illinois.

      j.      Metra provided commuter rail service to the six counties in the greater Chicagoland area.

### Requirements Concerning MBEs, WBEs, and DBEs

      k.      Various local governments, including the City of Chicago, the Village of Orland Park, and Metra, created programs designed to increase the utilization of categories of businesses known as minority business enterprises ("MBEs"), women's business enterprises ("WBEs"), and/or disadvantaged business enterprises ("DBEs").

      i.      Pursuant to an ordinance passed by the Chicago City Council in 1990, Chapter 2-92-420 *et seq.* of the amended Municipal Code, the City of Chicago established a Minority and Women Owned Business Enterprise Procurement Program.  The ordinance established an overall goal of annually awarding to MBEs not less than 25% and to WBEs not less than 5% of the total annual dollar value of all City contracts.  To this end,

the ordinance established that certain contracts would be designated as "target market contracts," meaning that these contracts would be open to bidding only by MBEs and WBEs. For contracts that were not target market contracts, and which were over $10,000, each contractor had to commit to having a certain percentage of MBE or WBE participation – either as a joint venture or subcontract, or by purchasing from an MBE or WBE.

ii.     To be certified by the City of Chicago as an MBE or WBE company under the City of Chicago ordinance and regulations promulgated thereunder, an applicant company was required to submit an MBE/WBE certification application and all required documentation to the City of Chicago demonstrating, among other things, that the applicant company met certain ownership and managerial requirements, including:

(a) that at least 51% of the company was owned and controlled by one or more minorities, women, or socially and economically disadvantaged individuals, and that the ownership and control was real, continuing and beyond the pro forma ownership as reflected in ownership documents;

(b) that the management and daily business operations of the company were controlled by one or more such individuals, who possessed the power to direct company policies and objectives and make all substantive, day-to-day decisions, and that primary responsibility for these functions was not vested in someone who was not a minority or a woman; and

(c) that the company was a viable, independent business and the minority or female principal of the company possessed the resources and expertise to operate in the company's area of speciality, without substantial reliance upon finances, resources, expertise, manpower, facilities, equipment, etc. of non-minority or non-women businesses.

iii.    A "City of Chicago Policy Regarding Minority and Women-Owned Business Enterprise (M/WBE) Certification as a Supplier, Distributor, and/or Broker," revised 7/21/04, restated the City's MBE ordinance, *see* §2-92-420(b), 480, and stated:

> "Firms acting as a broker are ***not eligible*** for certification as an MBE or WBE.

> A person or entity that fills orders by purchasing or receiving supplies from a third party supplier rather than out of its own existing inventory and provides no substantial service other than acting as a conduit between his or her supplier and his or her customer is a broker." [Emphasis in original.]

iv.    Pursuant to federal regulations, which were adopted by Metra, a DBE was defined by federal regulation, 49 CFR §26.5, as:

a for-profit small business concern—

> (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and

> (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it . . . .

v.    Furthermore, pursuant to federal regulation, the work of a DBE only could count toward a contract's DBE goal if the entity performed a "commercially useful function." A commercially useful function required that the DBE be responsible for the execution of the work on the contract and that the DBE actually perform, manage, and supervise the work involved. The DBE also had to "be responsible, with respect to materials

and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself." *See* 49 CFR §26.55.

## Relevant Contracts

### The O'Hare Contract

l.      In or about 2001, the City of Chicago determined that it would offer a target market contract for supplying the women's washrooms at O'Hare Airport with a feminine hygiene product disposal system manufactured by Company B. The contract was designed for an MBE or WBE contractor to obtain feminine hygiene disposal units from Company B, which the contractor would then be responsible for servicing, cleaning, and replacing during the life of the contract. (The contract will be referred to herein as the "O'Hare Contract.")

m.      The specifications issued prior to bids for the O'Hare Contract provided that the vendor could not subcontract more than 50% of the dollar value of the contract. Specifically, the specifications provided, in part, "[t]he prime Target Market vendor must perform at least 50% of the awarded contract amount with their own workforces. Up to 50% of the dollar value of the Target Market contract may be subcontracted."

### The Main Street Triangle Project

n.      In or about March 2005, the Village of Orland Park and Metra entered into an intergovernmental agreement for improvements to areas of the Village of Orland Park

and the construction of a new Metra station.  This project was known as the Main Street Triangle Project.

o.      As part of a contract between the Village of Orland Park and Company F, a contracting company hired by the Village of Orland Park, Company F agreed to use good faith in hiring MBEs and WBEs that were certified by Metra via the Illinois Unified Certification Program.   Company F further agreed that the MBE goal for the Main Street Triangle Project was 10% of the cost of the work, and that the WBE goal for the project was 5% of the cost of the work.

p.      In or about August 2007, Company C entered into a subcontract in which it agreed to provide landscaping for the Main Street Triangle Project.  As part of Company C's subcontract, it was required to provide a minimum of 10% MBE and 5% WBE participation.

**The O'Hare Runway Subcontract**

q.      In or about May 2006, the City of Chicago offered for bid a contract as part of the O'Hare Modernization Program.  The project was described as the South Airfield 10C-28C East Mass Grading Project.  The contract required at least 24% MBE and 4% WBE participation.

r.      Pursuant to the terms of the contract, MBE and WBE credit would only be given to MBEs and WBEs that performed a commercially useful function.  To perform a commercially useful function, the MBE or WBE was required to "actually perform[],

manage[e], and supervis[e] the work involved." The MBE or WBE also had to "be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself."

s. Also pursuant to the terms of the contract, an MBE or WBE could be a supplier on the contract only if it was a "regular dealer or supplier," meaning that the MBE or WBE "owns, operates, or maintains a store, warehouse or other establishment in which the materials or supplies required for the performance of the contract are bought, kept in stock, and regularly sold to the public." A regular dealer in certain items need not keep those items in stock so long as it "owns or operates distribution equipment." Finally, the contract stated that brokers would not be considered regular dealers.

t. Company E received the contract from the City of Chicago. Company E thereafter sought a subcontractor to supply reinforced concrete pipe for the project, and to meet the City of Chicago's MBE/WBE requirements. (The subcontract will be referred to herein as the "O'Hare Runway Subcontract.")

2. Beginning no later than in or about March 2001, and continuing until at least in or about July 2008, in Chicago and elsewhere within the Northern District of Illinois, Eastern Division,

AZTECA SUPPLY COMPANY,
AURORA VENEGAS, and
THOMAS MASEN,

defendants herein, and others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme and artifice to defraud and to obtain money and property, including contracts as an MBE, WBE, and/or DBE, as well as funds paid pursuant to contracts, from public entities, including the City of Chicago and the Village of Orland Park, by means of materially false and fraudulent pretenses, representations and promises, and material omissions, which scheme is further described below.

3.     It was part of the scheme that in obtaining and maintaining status as an MBE, WBE, and DBE, defendant AURORA VENEGAS falsely represented to the City of Chicago, among other things, that she performed a commercially useful function and that she did not perform brokering services, and further falsely represented that she was the only person who provided estimates for AZTECA SUPPLY COMPANY's contracts.

4.     It was further part of the scheme that based upon the false representations described above, defendant VENEGAS caused defendant AZTECA SUPPLY COMPANY to receive and maintain certification by various governmental entities, including the City of Chicago, as an MBE, WBE, and DBE, and thereafter, based upon AZTECA SUPPLY COMPANY's status as an MBE, WBE, and DBE for the City of Chicago, Metra provided reciprocal status pursuant to the Illinois Unified Certification Program.

5.     It was further part of the scheme that for certain contracts, defendant AURORA VENEGAS would learn from customers what supplies they needed and thereafter cause defendant AZTECA SUPPLY COMPANY to act solely as a broker to cause the shipment

of those items from an actual supplier to the customer, in violation of MBE, WBE and DBE requirements.

6.     It was further part of the scheme that defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY generated invoices and other documents to make it appear as though AZTECA SUPPLY COMPANY had complied with MBE, WBE, or DBE requirements in a transaction, for purposes of purported compliance with contracts and/or regulations, when in fact VENEGAS and AZTECA SUPPLY COMPANY had played no role whatsoever.

7.     It was further part of the scheme that defendant THOMAS MASEN, despite being employed by Company A, frequently directed defendant VENEGAS and defendant AZTECA SUPPLY COMPANY as to how much AZTECA SUPPLY COMPANY should charge for certain goods sold to customers and how much defendant VENEGAS should mark up the goods sold.

8.     It was further part of the scheme that defendant THOMAS MASEN frequently interacted directly with defendant AZTECA SUPPLY COMPANY's customers and used AZTECA SUPPLY COMPANY as a pass-through to make it appear that customers were purchasing goods from AZTECA SUPPLY COMPANY when, in fact, the customers were directly purchasing goods from Company A.

## The O'Hare Contract

9.      It was further part of the scheme that, in or about March 2001, in a bid signed and submitted by defendant AURORA VENEGAS for the O'Hare Contract, defendant AURORA VENEGAS fraudulently represented that defendant AZTECA SUPPLY COMPANY would provide feminine hygiene disposal service, and that AZTECA SUPPLY COMPANY would itself provide 95% of the value of the O'Hare Contract.

10.      It was further part of the scheme that, after receiving the O'Hare Contract, defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY did no significant work on the O'Hare contract and all significant portions of the work were performed by Company B, under an oral subcontract with AZTECA SUPPLY COMPANY.

11.      It was further part of the scheme that during the time period beginning in or about October 2001, and continuing until approximately September 10, 2007, defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY received a total of approximately $638,000 in payments from the City of Chicago through the fraudulently obtained O'Hare Contract.

## The Main Street Triangle Project

12.      It was further part of the scheme that in approximately 2007, defendant AURORA VENEGAS was approached by representatives from Company C (a landscaping installer),  and Company D (a landscaping supply company), and asked to act as a pass-through for the landscaping subcontract for the Main Street Triangle Project and, thereafter,

AURORA VENEGAS agreed to act as a fraudulent pass-through and informed a representative from Company C that she wanted approximately 5% of the subcontract payments.

13.     It was further part of the scheme that, during this subcontract for the Main Street Triangle Project, Company C directly communicated with Company D regarding the plants that Company C required for the landscaping job, and defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY effectively had no role in the landscaping subcontract.

14.     It was further part of the scheme that defendant AURORA VENEGAS agreed with representatives of Company C and Company D that defendant AZTECA SUPPLY COMPANY would generate invoices and other documents to make it appear as though AZTECA SUPPLY COMPANY had purchased the plants from Company D and supplied them to Company C in order to comply with the contract's MBE and WBE requirements, when, in reality, AURORA VENEGAS and AZTECA SUPPLY COMPANY had no role in connection with the ordering, warehousing, storage, or delivery of the plants relating to the subcontract.

15.     It was further part of the scheme that in or about 2007, defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY received a total of approximately $57,168 in payments from Company C for the Main Street Triangle Project.

### The O'Hare Runway Subcontract

16.     It was further part of the scheme that in or about February 2007, defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY received the O'Hare Runway Subcontract with Company E, and in that subcontract defendant AURORA VENEGAS agreed that AZTECA SUPPLY COMPANY would supply reinforced concrete pipe, and that AZTECA SUPPLY COMPANY would not subcontract any portion of the work.

17.     It was further part of the scheme that defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY provided no useful services to Company E as part of the O'Hare Runway Subcontract and that Company E dealt directly with Company A for Company E's concrete pipe needs on the O'Hare Runway Subcontract.

18.     It was further part of the scheme that Company E received quotes and ordered concrete pipe products directly from Company A and defendant THOMAS MASEN, and thereafter THOMAS MASEN would direct defendant AZTECA SUPPLY COMPANY regarding how much it should charge Company E for the pipe products, as well as how much profit AZTECA SUPPLY COMPANY should make on the sale of each item.

19.     It was further part of the scheme that, in relation to the O'Hare Runway Subcontract, defendant AURORA VENEGAS and defendant AZTECA SUPPLY COMPANY did not control the delivery of goods ordered from Company A and sent to Company E, but instead, an employee of Company E would contact defendant THOMAS

MASEN to schedule and make arrangements for deliveries of concrete pipe and, thereafter,

THOMAS MASEN would direct a trucking company to deliver the goods to Company E's

job site and then instruct AZTECA SUPPLY COMPANY to pay the trucking company.

20.     It was further part of the scheme that neither defendant AURORA VENEGAS

or defendant AZTECA SUPPLY COMPANY did any substantial part of the estimating,

ordering, purchasing, or delivery of the concrete pipe until after the Federal Bureau of

Investigation executed search warrants at Company A and AZTECA SUPPLY COMPANY

on or about July 17, 2008.

21.     It was further part of the scheme that between in or about May 2007 and in or

about July 2008, defendant AZTECA SUPPLY COMPANY received more than $9,000,000

in payments on the O'Hare Runway Subcontract.

## Acts of Concealment

22.     It was further part of the scheme that defendant AURORA VENEGAS

knowingly caused the submission of false statements to the City of Chicago to conceal the

fact that defendant AZTECA SUPPLY COMPANY was acting as a pass-through on behalf

of Company A and other companies, including, but not limited to: (1) No-Change Affidavits,

certifying that AZTECA SUPPLY COMPANY remained eligible as an MBE and WBE for

the City of Chicago; (2) Schedule D-1s (affidavits of MBE and/or WBE goal implementation

plans); and (3) Schedule Cs (letters of intent to perform as an MBE and/or WBE

subcontractor or supplier).

-13-

23.     It was further part of the scheme that following an interview between defendant AURORA VENEGAS and an investigator with the City of Chicago Inspector General's Office in November 2007, AURORA VENEGAS, acting with defendant THOMAS MASEN and others, took steps to make it appear that defendant AZTECA SUPPLY COMPANY maintained an inventory of concrete pipe at the plant of Company A and was responsible for shipping and delivering goods, including creating records in order to make it appear that an active inventory account was maintained in the accounting records of AZTECA SUPPLY COMPANY, when that had not been and was not true.

24.     It was further part of the scheme that following the November 2007 interview with the investigator from the City of Chicago Inspector General's office, defendant AURORA VENEGAS "staged" the warehouse of defendant AZTECA SUPPLY COMPANY to make it appear that she kept inventory of other products there, which staging included a request by AURORA VENEGAS to "borrow" inventory from another company so that, if an inspection occurred, AZTECA SUPPLY COMPANY could falsely convey the impression that it maintained products that it claimed to sell.

25.     It was further part of the scheme that defendant AURORA VENEGAS, acting with others, misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the scheme.

26.     On or about December 28, 2005, at Chicago, in the Northern District of Illinois,

AZTECA SUPPLY COMPANY,
and AURORA VENEGAS,

defendants herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon, an envelope containing City of Chicago check number 40672573, payable to AZTECA SUPPLY COMPANY, in the amount of $9,474.05, and accompanying paperwork, that envelope being addressed to AZTECA SUPPLY COMPANY in Chicago, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 25 of Count One are realleged and incorporated herein by reference.

2.      On or about September 10, 2007, at Chicago, in the Northern District of Illinois,

AZTECA SUPPLY COMPANY,<br>
and AURORA VENEGAS,

defendants herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon, an envelope containing a City of Chicago payment invoice, that envelope being addressed to AZTECA SUPPLY COMPANY in Chicago, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THREE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 through 25 of Count One are realleged and incorporated herein by reference.

2.    On or about December 20, 2007, at Chicago, in the Northern District of Illinois,

AZTECA SUPPLY COMPANY,
and AURORA VENEGAS,

defendants herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by a commercial interstate carrier, namely Federal Express, according to the direction thereon, an envelope containing a check in the amount of $57,168.44, and accompanying invoices, sent from Company C to AZTECA SUPPLY COMPANY in Chicago, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## **COUNT FOUR**

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 25 of Count One are realleged and incorporated herein by reference.

2.      On or about April 8, 2008, at Chicago, in the Northern District of Illinois,

AZTECA SUPPLY COMPANY,<br>
AURORA VENEGAS, and<br>
THOMAS MASEN,

defendants herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing a sales order in the amount of $1,460,610, sent from AZTECA SUPPLY COMPANY in Chicago, Illinois, to Company E in Elgin, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## **COUNT FIVE**

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 25 of Count One are realleged and incorporated herein by reference.

2.      On or about March 12, 2008, at Chicago, in the Northern District of Illinois,

AZTECA SUPPLY COMPANY,
AURORA VENEGAS, and
THOMAS MASEN,

defendants herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by a commercial interstate carrier, namely Federal Express, according to the direction thereon, an envelope containing documents showing that AZTECA SUPPLY COMPANY had paid trucking expenses incurred by Company A for the O'Hare Runway Subcontract, sent from AZTECA SUPPLY COMPANY in Chicago, Illinois to Company A in Franklin Park, Illinois;

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIX

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1(a) through 1(d) are realleged and incorporated herein by reference.

2.      In 2008, the Federal Bureau of Investigation was investigating fraudulent conduct relating to AZTECA SUPPLY COMPANY and its work on certain contracts. As of July 17, 2008, the following matters, among others, were material to the investigation:

a.      Whether defendant THOMAS MASEN and Company A were actually doing work on contracts that defendant AZTECA SUPPLY COMPANY was required to do pursuant to AZTECA SUPPLY COMPANY's contractual obligations and MBE, WBE, and DBE regulations; and

b.      Whether defendant AURORA VENEGAS was operating defendant AZTECA SUPPLY COMPANY independently as well as controlling the management and daily business operations of AZTECA SUPPLY COMPANY, as was required pursuant to the City of Chicago MBE / WBE ordinance.

3.      On or about July 17, 2008, at Franklin Park, in the Northern District of Illinois, Eastern Division,

THOMAS MASEN,

defendant herein, knowingly and willfully did make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal

Bureau of Investigation, an agency within the executive branch of the Government of the United States, in that defendant, when interviewed by a Special Agent of the Federal Bureau of Investigation, stated in sum and substance that:

      (a)    AZTECA SUPPLY COMPANY decided its own markup before bidding on a job, and Company A offered no input in AZTECA SUPPLY COMPANY's markup; and

      (b)    THOMAS MASEN had no input in running AZTECA SUPPLY COMPANY;

when in fact, as defendant well knew, each of these statements and representations was false;

In violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY