# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 10 CR 80 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| AZTECA SUPPLY CO., AURORA VENEGAS, | ) | |
| and THOMAS MASEN, | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' joint motion to dismiss Counts One through Five of the indictment [30]. For the reasons set forth below, the Court respectfully denies the joint motion to dismiss [30].

**I.      Background**

On February 4, 2010, a grand jury returned a six count indictment, charging Defendants Azteca Supply Co., Inc. ("Azteca"), Aurora Venegas, and Thomas Masen with mail fraud in violation of 18 U.S.C. § 1341.[1] As charged in the indictment, the government alleges that Defendants devised and participated in a scheme to defraud the City of Chicago ("the City") and the Village of Orland Park ("the Village") of money and property – specifically, contracts for minority business enterprises ("MBEs"), women's business enterprises ("WBEs"), and/or disadvantaged business enterprises ("DBEs"), as well as funds paid pursuant to those contracts. *Id.* at ¶ 2. The indictment sets forth the requirements for the pertinent MBE, WBE, and DBE programs, and alleges that Aurora Venegas and Azteca Supply Company falsely represented that they met certain program requirements when in fact they did not. *Id.* at ¶¶ 1-6. The indictment further alleges that Thomas Masen used Azteca Supply Company as a "pass-through," meaning that Masen's own company performed work that was supposed to be performed by Azteca

---

[1]  Count Six, which alleges that Defendant Masen made a false statement to the FBI, is not the subject of the present motion.

Supply Company, and that Azteca Supply Company was not performing the functions required under the MBE, WBE, or DBE programs. *Id.* at ¶ 7-8.

The indictment describes three separate contracts or subcontracts that were part of the fraudulent scheme. *Id.* at ¶ 9-21. With respect to the first contract, known as the "O'Hare Contract," the City of Chicago engaged Azteca to provide feminine hygiene disposal systems in the women's bathrooms at O'Hare Airport. According to the indictment, Venegas represented that Azteca "would itself provide 95% of the value of the O'Hare Contract," but in reality "did no significant work" and subcontracted "all significant portions of the work." Aurora Venegas and Azteca Supply Company received approximately $638,000 in payments from the City of Chicago for the "O'Hare Contract." *Id.* at ¶ 11.

With respect to the second contract, known as the "Main Street Triangle Project," the Village of Orland Park contracted with Company F to construct a new Metra train station. According to the indictment, "Company F agreed to use good faith in hiring MBEs and WBEs that were certified by Metra" and further "agreed that the MBE goal for the Main Street Triangle Project was 10% of the cost of the work, and that the WBE goal for the project was 5% of the cost of the work." *Id.* at ¶ 1(o). Company F in turn subcontracted with Company C to provide landscaping services for the project. *Id.* at ¶ 1(p). Company C's subcontract with Company F required it "to provide a minimum of 10% MBE and 5% WBE participation." *Id.* The indictment further charges that Company C arranged to purchase certain plants from Company D, then representatives from Companies C and D approached Defendant Venegas and asked her "to act as a pass-through for the landscaping subcontract." *Id.* at ¶ 12. The indictment alleges that Azteca had no role in providing the plants to Company C yet generated documents to make it appear that Azteca had purchased the plants from Company D and supplied them to Company

2

C. *Id*. at ¶ 14. Aurora Venegas and Azteca Supply allegedly received a total of approximately $57,168 in payments from the Main Street Triangle Project. *Id.* at ¶ 15.

With respect to the third contract, the "O'Hare Runway Subcontract," Azteca supplied reinforced concrete pipe to Company E, which contracted with the City of Chicago to rebuild a runway as part of the O'Hare Modernization Program. *Id.* at ¶¶ 1(q), 16. The City's contract with Company E allegedly required "at least 24% MBE and 4% WBE participation" and "credit would only be given to MBEs and WBEs that performed a commercially useful function." *Id.* at ¶¶ 1(q), 1(r). Azteca allegedly "provided no useful services to Company E." *Id.* at ¶ 17. Instead, the indictment charges that Company E dealt directly with Company A, the concrete pipe manufacturer that employed Defendant Masen, and Masen allegedly directed Azteca as to how much it should charge Company E for pipe, how much profit Azteca should make, and how much Azteca should pay the trucking company to deliver the pipe to O'Hare. *Id.* at ¶¶ 17-19. Azteca Supply Company received more than $9,000,000 in payments from the O'Hare Runway Subcontract. *Id.* at ¶ 21.

## II. Legal Standard

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a party to make a pretrial motion that challenges the sufficiency of an indictment or an information. The contents of an indictment or information, in turn, are spelled out in Federal Rule of Civil Procedure 7(c)(1). The Seventh Circuit teaches that an indictment is constitutionally adequate and complies with Rule 7(c)(1) where it (i) states the elements of the offense charged, (ii) fairly informs the defendant of the nature of the charge so that he or she may prepare a defense, and (iii) enables the defendant to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997); see also *Hamling v. United States*, 418

U.S. 87, 118 (1974) (discussing precedent and describing when the language of an indictment will be deemed sufficient); *Russell v. United States*, 369 U.S. 749, 763 (1962) (among the criteria for gauging sufficiency of an indictment are whether it includes "the elements of the offense intended to be charged" and whether is "sufficiently apprises the defendant of what he must be prepared to meet").

The Supreme Court has long held that "[a]n indictment returned by a legally constituted and unbiased grand jury, * * * if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. U.S.*, 350 U.S. 359, 362 (1956). Indictments are to be reviewed "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723 (7th Cir. 2008). A motion to dismiss an indictment is not "a means of testing the strength or weakness of the government's case.'" *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). Thus, while an indictment may be dismissed if subject to a defense that raises a purely legal question (*United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003)), a defense that relates to the strength of the Government's evidence ordinarily must wait for the trial. *Moore*, 563 F.3d at 586 (inquiry at the motion to dismiss phase is to determine "if it's possible to view the conduct alleged" as constituting the crime alleged); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (noting the ordinary rule while affirming a district court that dismissed an indictment as to which, under the undisputed facts, "there was no case to prove").

## III. Analysis

Pursuant to 18 U.S.C. § 1341 (the "mail fraud statute"),

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized

4

> depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, * * * shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341 (emphasis added). Both the Supreme Court and the Seventh Circuit interpret the mail fraud statute as requiring that the object of the fraud be a property right. See *Cleveland v. United States,* 531 U.S. 12, 26 (2000) ("[w]e conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands"); *McNally v. United States,* 483 U.S. 350, 360 (1987) ("we read § 1341 as limited in scope to the protection of property rights"); see also *United States v. Leahy,* 464 F.3d 773, 787 (7th Cir. 2006) ("The mail and wire fraud statutes require that the object of the fraud is money or property, rather than an intangible right."). Defendants contend that the indictment fails to allege that any entity suffered a monetary loss as a result of the allegedly fraudulent conduct because the lowest bidder received each of the contracts at issue, and there is no allegation that the City of Chicago, the Village of Orland Park, or any other entity would (or could) have paid less for what they received absent the allegedly fraudulent conduct. In other words, Defendants contend that the City and the Village received the goods and services that they contracted to receive and that Azteca provided everything that it was obligated to provide. Therefore, Defendants maintain that the indictment does not state a cognizable claim that Defendants schemed to defraud the victims of "money or property" under the federal mail fraud statute and that whatever "regulatory interests" the City of Chicago and the Village of Orland Park had in promoting minority participation in city contracts are not "property" interests within the scope of the federal fraud statutes.

In *Leahy,* the defendants were charged with violations of mail and wire fraud statutes in connection with alleged fraudulent activity related to the City's MBE and WBE programs. 464 F.3d at 778-81. Like Defendants here, the defendants in *Leahy* claimed that the counts of the

indictment related to fraud in connection with the MBE and WBE programs "charged an intangible rights scheme." *Id.* at 787. Specifically, the defendants argued that because the City "would ostensibly have paid the same for the provided [cleaning and janitorial] services," it had "lost no money" and thus no property right was involved. *Id.* The *Leahy* defendants claimed that "Chicago only lost a regulatory interest in controlling where its money went." *Id.* The Seventh Circuit rejected this argument, stating that "[d]espite the defendants' contortions to squeeze this case into the intangible rights category, we cannot agree that it is such a case." *Id.* Instead, the *Leahy* court determined that the object of the fraud related to the MBE and WBE programs was money "taken under false pretenses from the [C]ity in its role as a purchaser of services." *Id.* at 788. Although the City received one of the services that it contracted for, the cleaning and janitorial services, the court held that it "completely lost the other type of services for which it was paying [the defendants] – services performed by an MBE or WBE * * *." *Id.*; see also *id.* ("Chicago suffered a loss of money in that it paid for a service provided by an MBE or WBE that it did not receive * * * *"). Accordingly, the Seventh Circuit held that the defendants' actions in defrauding the City of Chicago by falsely certifying that a company was in compliance with Chicago's MBE/WBE requirements could constitute mail and wire fraud.

Defendants in this case acknowledge *Leahy,* but maintain (i) that this case can be distinguished from *Leahy* and (ii) that the government's position cannot be reconciled with the Supreme Court's controlling decision in *McNally v. United States.* See 483 U.S. at 360. In addition, Defendants argue that the City's and the Village's interests in promoting and regulating the MBE/WBE programs are "purely regulatory" and thus, under *Cleveland,* do not constitute money or property under the statutes.[2] *Id.* at 11-14. Defendants attempt to distinguish the

---

[2] Defendants acknowledge that the Seventh Circuit has rejected the regulatory argument premised on *Cleveland* but wish to preserve the issue for appeal.

6

instant case by arguing that, in contrast to the defendants in *Leahy*, Defendants here are not alleged to have fraudulently obtained an MBE or WBE certification from the City. In other words, Azteca was not "entirely a sham" because Azteca was a well-established business with actual operations that was wholly owned by a minority woman who managed the day-to-day affairs of the company. In contrast, the minority business at issue in *Leahy* was an "empty formality" established by a white businessman who made "all substantive financial and business decisions for the company." 464 F.3d at 789. However, this factual distinction is of no legal consequence. The indictment alleges that Defendants certified that they would contract and subcontract for goods or services from certified minority and women businesses when in fact Defendants did not actually obtain such goods or services. Therefore, even if Defendants did not obtain a fraudulent certification, they are still alleged to have engaged in fraud related to the MBE and WBE programs.

In addition to the factual differences, Defendants also claim that their primary argument – that *McNally* controls the outcome of this case – was not addressed in earnest by the Seventh Circuit in *Leahy*. In fact, most of the discussion in *Leahy* focused on *Cleveland*. In *Cleveland,* the alleged scheme was based on defrauding the government out of a video poker license by making false statements on the license application. 531 U.S. at 15-17. The Supreme Court determined that this alleged conduct did not implicate the government's role as a property holder. *Id.* at 23-24. The Court held that even though the government had a right to choose to whom it would award a license, that right was not properly characterized as a property right, but rather as an intangible right related to "the power to regulate." *Id.*; see also *Leahy*, 464 F.3d at 787-88. The Seventh Circuit, however, determined that the City's interest in *Leahy* was not purely regulatory (as in *Cleveland*) because the scheme "precisely and directly targeted

7

Chicago's coffers and its position as a contracting party." *Id.* at 788; see also *id.* ("*Cleveland* addresses a situation in which defendant commits fraud against a governmental body acting as regulator; here the fraud was committed against Chicago as regulator and also against the city as property holder."). Unlike in *Cleveland*, the *Leahy* defendants' scheme did not turn on defrauding the government out of a license (thus merely implicating the government's role as sovereign); rather, the *Leahy* court determined that the defendants defrauded the government out of its money. *Id.*; see also *United States v. Fenzl*, 2010 WL 1790872, at *2-3 (N.D. Ill. April 19, 2010).

Although the *Leahy* court focused more of its attention on *Cleveland*, the court did cite *McNally*. See *Leahy,* 464 F.3d at 787 (noting that defendants argued "that the mail and wire fraud counts of the indictment charged an intangible rights scheme, which cannot survive under Supreme Court precedent like *McNally*"). And a review of *McNally* itself reveals that *Leahy* and this case are distinguishable from the facts of *McNally*. As the Supreme Court noted, the facts presented in *McNally* did not involve a charge, and the jury was not required to find, that the Commonwealth was defrauded of any money or property.[3] 483 U.S. at 360. Here, the government explicitly charges that the City and the Village were defrauded of more than the intangible right to have public officials perform their duties honestly, which was the precise issue in *McNally*. The Government contends in this case that Defendants defrauded the City and the Village of the bargained-for services and that the deprivation of those services constitutes a loss of money and property – in other words, paying on a contract in which you don't receive the bargained for consideration constitutes a deprivation of property and money. Therefore, the

---

[3] The *McNally* Court also noted that there was no charge to the jury that it needed to find "that the Commonwealth was deprived of control over how its money was spent." However, since *McNally*, the Supreme Court decided *Cleveland*.

8

precise legal issue presented here, and decided by the Court in *Leahy*, was not decided by *McNally*.

To put a finer point on it, as the Third Circuit (in line with the Seventh) has posited, a jury is entitled to find that by depriving a governmental entity of a "fundamental basis of [its] bargain," a defendant can deprive that entity of a property right. See *U.S. v. Tulio*, 263 Fed. Appx. 258, 262 (3d Cir. 2008). Unlike in *McNally*, the City and Village were deprived of more than just a citizen's intangible right to have the government's affairs conducted honestly. Instead, the fraudulent scheme here (and in *Leahy*) implicated the City's and Village's roles as property holders, purchasing goods and services in the open market. See *Tulio*, 263 Fed. Appx. at 262; see also *Cleveland*, 531 U.S. at 24 (differentiating the government's role as sovereign from its role as property holder, selling goods and services in the open market). The City and Village were deprived of their contract rights when Defendants appropriated money that the City and Village had intended to enable a WBE or MBE to provide services for the City and Village. Beyond property rights, the scheme directly targeted the City of Chicago's and Village of Orland's "money, plain and simple," as each paid for services – construction done by certified WBEs and MBEs – that it did not wholly receive. *Leahy*, 464 F.3d at 788. While both the City and the Village received services, they were not the services for which they had contracted.

Although Defendants urge the Court to find that *McNally* and *Leahy* are irreconcilable, a review of the two decisions does not lead to that conclusion. The Supreme Court may one day decide this precise issue differently than the *Leahy* court did. But, unless and until that happens, *Leahy* controls in this circuit. The crux of Defendants' argument is that *Leahy* was wrongly decided; however, this Court is bound to follow Seventh Circuit precedent where it has direct application in a case. See *Bingham v. New Berlin Sch. Dist.,* 550 F.3d 601, 605 (7th Cir. 2008)

(citing *Hutto v. Davis,* 454 U.S. 370, 375 (1982)) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent [ ] must be followed by the lower federal courts.")). Under *Leahy,* the portions of the indictment premised on violations related to subcontracting with an MBE or WBE constitute an unlawful scheme to defraud the City of money or property under the federal mail fraud statute.

Finally, Defendants contend that even under *Leahy*, the charges based on the Main Street Triangle Project must be dismissed. According to Defendants, because the Village of Orland Park did not require that a certain percentage of the work under the contract be performed by minority businesses, but instead required only that the companies "use good faith in hiring MBEs and WBEs that were certified by Metra via the Illinois Unified Certification Program," the Village was not deprived of anything. Yet, in the same way that the Government alleges that the City was thwarted in its efforts to obtain services that it bargained for, so too was the Village thwarted. In each of the three situations, the Government has alleged that Defendants deprived the City or the Village of the benefit of their bargains by failing to perform commercially useful functions. Whether termed a requirement or a goal, the misconduct alleged in the indictment sufficiently alleges that both the City and the Villlage were deprived of the services that they sought and paid for – services that were to be performed by an MBE or WBE. Whether in response to a "requirement" or a stated "goal," the fraud alleged here related to a false representation that Defendants met certain program requirements, when in fact they did not, the result of which was that Defendants obtained the municipalities' money.

## IV. Conclusion

For the reasons stated above, the joint motion to dismiss [30] is respectfully denied.

Dated: October 6, 2010

Robert M. Dow, Jr.
United States District Judge